*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0429p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEAGUE OF WOMEN VOTERS OF OHIO, et al.,
                                *Plaintiffs-Appellees,*

JEANNE WHITE,

                                *Intervenor-Appellee,*

        *v.*

JENNIFER BRUNNER, in her official capacity as
Secretary of State of Ohio, et al.,
                                *Defendants-Appellants.*

Nos. 06-3335/3483/3621

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
Nos. 05-07309—James G. Carr, Chief District Judge.

Argued: October 21, 2008

Decided and Filed: November 26, 2008

Before: KEITH, MERRITT, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Richard N. Coglianese, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Jennifer Rebecca Scullion, PROSKAUER ROSE, New York, New York, for Appellees. **ON BRIEF:** Richard N. Coglianese, Damian W. Sikora, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Jennifer Rebecca Scullion, PROSKAUER ROSE, New York, New York, Jon M. Greenbaum, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, Washington, D.C., Steven P. Collier, Jason A. Hill, CONNELLY, JACKSON & COLLIER, Toledo, Ohio, John A. Freedman, Michael R. Geske, ARNOLD & PORTER, Washington, D.C., Kathleen McCree Lewis, DYKEMA GOSSETT, Detroit, Michigan, Brenda Wright, DEMOS: A NETWORK FOR IDEAS AND ACTION, Brighton, Massachusetts, Richard Marvin Kerger, Kimberly A. Conklin, KERGER & HARTMAN, Toledo, Ohio, for Appellees.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellees League of Women Voters of Ohio, League of Women Voters Toledo-Lucas County, and individual registered voters in Ohio allege that Ohio's voting system is so deficient as to deny or severely burden their fundamental right to vote. They brought suit in the United States District Court for the Northern District of Ohio against defendants-appellants the Secretary of State of Ohio and the Governor of Ohio,[1] alleging violations of equal protection, substantive due process, procedural due process, and the Help America Vote Act of 2002 ("HAVA"). Intervenor-appellee Jeanne White alleges that touchscreen voting machines utilized in Ohio violate her constitutional rights to equal protection and substantive due process. The district court dismissed the HAVA claim but allowed the parties to proceed on their constitutional claims. We agree that the plaintiffs and intervenor have pled sufficient facts to survive a motion to dismiss with respect to their equal protection and substantive due process claims, but we find that the plaintiffs have not alleged facts that would establish a violation of procedural due process, if proven. Therefore, we affirm in part and reverse in part.

I.

This case arises out of the November 2004 elections in Ohio. On July 28, 2005, plaintiffs-appellees League of Women Voters of Ohio, League of Women Voters Toledo-Lucas County, and individual Ohio voters[2] (collectively, "League") filed a sixty-six page, 212-paragraph complaint alleging "a voting system in Ohio" that suffers from "non-uniform standards, processes, and rules, and that employs untrained or improperly trained personnel, and that has wholly inadequate systems, procedures, and funding." The League alleges that these deficiencies deny Ohioans the fundamental right to vote and violate the Equal Protection and Due Process Clauses. Further, the League alleges that the problems with Ohio's voting system date back at least to 1971 and are "pervasive, severe, chronic, and persistent." Accordingly, the League seeks declaratory and injunctive relief to require defendants-appellants the Secretary of State of Ohio and the Governor of Ohio "to put in place a competent and fair voting system."

The plaintiffs in this case include two organizational plaintiffs and numerous individual Ohio voters. The League of Women Voters of Ohio ("LWVO") is a nonpartisan organization with more than 3,000 members statewide. LWVO alleges that the Secretary's and Governor's actions and inactions caused it injury by impeding its voter registration and education efforts and by injuring the rights of its individual members, who are alleged to have standing in their individual capacities. The League of Women Voters of Toledo-Lucas County is a nonpartisan organization affiliated with the LWVO that alleges standing on essentially the same grounds as the LWVO. The individual plaintiffs are registered voters in Ohio who allege they were denied the right to vote or severely burdened in exercising the right to vote during the November 2004 election.

---

[1] Jennifer Brunner was sworn in as Secretary of State of Ohio on January 12, 2007. Ted Strickland was sworn in as Governor of Ohio on January 8, 2007. Secretary Brunner and Governor Strickland are automatically substituted for their predecessors pursuant to Fed. R. App. P. 43(c)(2).

[2] The appellees are Darla Stenson, Charlene Dyson, Anthony White, Deborah Thomas, Leonard Jackson, Deborah Barberio, Mildred Casas, Sadie Rubin, Lena Boswell, Chardell Russell, Dorothy Cooley, and Lula Johnson-Ham. The original complaint also included the allegations of Dorothy Stewart, Justine Watanabe, and Jimmie Booker, all of whom were later allowed to withdraw as parties.

The individual plaintiffs allege that they were disenfranchised or severely burdened in exercising the right to vote in that the following occurred on November 2, 2004:

Mildred Casas went to her polling location at Ohio State University, but poll workers told her she was at the wrong location for her address and sent her to the King Avenue Methodist Church. At the church, poll workers again told Casas she was at the wrong location and sent her to the Newman Center. At the third location, poll workers informed Casas she was not on the list. Finally, they provided a provisional ballot to Casas. These events took more than six hours.

Sadie Rubin went to her polling place on the Kenyon College campus. That location had two voting machines for approximately 1,300 voters; one of the machines broke during the day. Rubin waited in line for more than nine hours in order to vote. Voting was completed there at approximately 4:00 a.m. the following day.

Deborah Thomas went to the polling place where she has voted for almost twenty years and was told she was not on the voter list. Poll workers gave Thomas a provisional ballot. The ballot was not counted and the county board of elections has no record of Thomas's attempts to vote.

Anthony White went to his polling place, where poll workers informed him he was not on any of the voter lists at that location. Poll workers then gave White a provisional ballot. The ballot was not counted and the county board of elections has no record of White's attempts to vote.

Leonard R. Jackson went to his polling place and was told he was not on the voter list. Poll workers gave Jackson a provisional ballot, which was not counted. The county board of elections has no record of Jackson's attempts to vote.

Lena Boswell went to her polling place and was told she was not on the voter list; therefore, she cast a provisional ballot. Boswell contacted the board of elections and learned that either she had been expunged from the rolls or her information had been removed when the board of elections changed computer systems. Boswell's provisional ballot had not been counted as of November 22, 2004.

Darla Stenson went to her polling place but was told she was not on the voter list. The polling place included multiple precincts, but poll workers did not check to see if Stenson's name appeared on another precinct list. Poll workers then gave Stenson a provisional ballot, which was not counted because it was cast in the wrong precinct.

Chardell Russell went to her polling location and was given a paper ballot. Poll workers sent Russell to a table with screens to fill out her ballot. The screens did not provide adequate privacy. Poll workers then told Russell that the voting machine was not working and her ballot would be counted later; they did not tell her how to confirm that her vote was later counted.

Lula Johnson-Ham went to her polling place and learned the voting machine was not working. Poll workers instructed Johnson-Ham to place her ballot on the side of the machine so that it could be counted later. They did not tell her how to confirm that her vote was later counted.

Dorothy Cooley went to her polling place with her eight-year-old son. Both wore Bush/Cheney 2004 tee shirts. A poll worker told Cooley she could not vote unless she took off or covered her shirt. Cooley questioned the worker about the legal basis for this action. The worker then directed Cooley to the police, causing Cooley to fear she would be arrested in front of her son. Cooley then took off her outer tee shirt in order to vote.

Charlene Dyson was concerned about gaining access to her polling place because she uses a wheelchair. Dyson called her county board of elections and was informed that a poll worker would bring a ballot to her car. When she arrived at the polling place, poll workers refused to bring a ballot to Dyson's car and stated that they were not aware of any obligation to do so. Dyson left without voting.

Deborah Barberio was eligible to vote in the election, and her name appeared on the relevant voter roll. Barberio's husband received a voter information card at the home they shared, but Barberio did not. Barberio then confirmed with the county board of elections that she was registered. On election day, poll workers informed Barberio that she was not on the registration list and suggested she complete a provisional ballot. The board of elections later maintained that Barberio was not registered and did not count her ballot.

The individual plaintiffs voted or attempted to vote in Lucas, Franklin, Cuyahoga, Knox, and Medina Counties. The League alleges that these incidents of disenfranchisement or severe burdening of the right to vote were more likely to occur in those counties than elsewhere in Ohio. The League further alleges that each of the individual plaintiffs has a reasonable basis to believe that she will be disenfranchised, or severely burdened in exercising her right to vote, in future elections.

The League maintains that the above were not isolated incidents. Rather, the League alleges that systemic failures occurred in November 2004 with respect to:

(1) registration: Registered voters did not appear on voting rolls in their precincts and were denied the right to vote by provisional ballot, or their provisional ballots were not counted. The Secretary issued a directive instructing local officials "not to accept voter registration forms unless printed on paper of a specified color, weight, and type," impeding new voter registration;

(2) absentee ballots: Voters who requested absentee ballots did not receive them or received them too late yet were precluded from voting in person. Election workers improperly denied requests for absentee ballots;

(3) polling places: Election officials provided voters with wrong information about polling places, causing voters to travel to multiple polling places. Voters who were unable to spend hours traveling to multiple polling places were unable to vote. Many polling places did not open on time, causing voters to leave without voting in order to attend school or work. Some polling places closed early; at others, poll workers sent voters away without voting, contrary to Ohio law that permits anyone in line as of closing time to vote.

Too few voting machines were allocated to meet the predicted voter turnout, resulting in wait times from two to twelve hours. The ratio of voters to voting machines varied from county to county and within counties. Insufficient voting machines and long wait times caused 10,000 Columbus voters not to vote; caused voters to wait for hours in the rain; caused one voter to faint in line; and caused many voters to leave without voting to attend work, school, or provide care to family members. Poll workers did not inform these voters of their right to vote by paper ballot.

Many voting machines were broken or malfunctioned. For example, in Mahoning County, machines caused votes to "jump" from the voter's chosen candidate to another candidate, while other machines went blank or reset when the voter attempted to select a candidate. In Cuyahoga County, one polling location shut down because of machine malfunction and another ran out of ballots;

(4) poll workers: Poll workers were unfamiliar with voting rules, machines, and procedures. Consequently, poll workers committed various errors that led to disenfranchisement. For example,

some poll workers required every voter to show identification, although Ohio law does not so require; provided incorrect instructions as to how to use voting machines, resulting in lost votes; directed voters to the wrong precinct, causing votes to be discounted; and failed to provide curbside assistance to wheelchair-bound voters as required by Ohio law;

(5) provisional balloting: Poll workers did not provide provisional ballots where necessary, causing voters to leave without voting. Others provided provisional ballots without ensuring that they were cast in the correct precinct, causing votes to be thrown out. Still others ran out of provisional ballots or envelopes or never had any at all. Consequently, 22% of provisional ballots cast were not counted, with the percentage ranging from 1.5% to 39.5% from county to county; and

(6) disabled voters: Some polling places were not accessible. At others, poll workers refused curbside assistance as required by law or disallowed assistance to blind voters. Long wait times disproportionately affected disabled voters, many of whom were not able to stand in line for extended periods of time.

The League alleges that these failures were not new. Rather, the League points to the 1971, 1972, 1994, 1996, 1998, 2000, and 2001 elections for examples of registration problems, improper purging of voters from the rolls, voting machine malfunction, miscounting of votes, polling places with too few ballots, late openings, inadequate staffing and training of poll workers, and poll worker corruption. The League maintains that the Secretary and Governor knew of these problems yet failed to act despite their authority to do so.

Based on the above, the League alleges that the Secretary and Governor violated 42 U.S.C. § 1983 in that Ohio's voting system denies them equal protection of the law[3] and substantive[4] and procedural due process[5] guaranteed them by the Fourteenth Amendment to the United States Constitution. The League also alleges a violation of the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15301 *et seq.*[6] Accordingly, the League seeks preliminary and permanent injunctive relief requiring the Secretary and Governor "[t]o promulgate, adopt, and enforce uniform standards" related to various aspects of Ohio's election system including voter registration, absentee ballots, voting machines, ballots, voting procedures, recruiting and training of poll workers, and assistance for disabled voters.

The Secretary and Governor filed their first motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (6), and (7) on August 29, 2005. The main thrust of the motion was that the League had sued the wrong parties–the Secretary of State and the Governor–for wrongs allegedly committed by the local county Boards of Election ("BOEs"). As a result of this error, the Secretary and Governor argued that the League had failed to state a claim against them. By a case management order dated September 26, 2005, the district court ordered the parties to begin discovery while the motion to dismiss was pending.

---

[3]Violation of equal protection is alleged on behalf of all plaintiffs.

[4]Violation of substantive due process is alleged on behalf of all plaintiffs.

[5]Violation of procedural due process is alleged on behalf of LWVO, League of Women Voters Toledo-Lucas County, Stenson, White, Thomas, Jackson, and Barberio.

[6]Violation of HAVA is alleged on behalf of LWVO and League of Women Voters Toledo-Lucas County.

On October 4, 2005, intervenor-appellee Jeanne White moved to intervene as a party plaintiff. White alleges that on November 2, 2004, she attempted to vote for president at her polling place in Mahoning County. That polling place utilized direct-recording electronic voting machines, more commonly known as touchscreen voting machines. White attempted to select the candidate she preferred, but the machine "jumped" from her candidate to another candidate. The machine "jumped" several times when White attempted to correct this problem. White believes that her vote may have been counted for the wrong candidate. She also alleges that "jumping" occurred on other machines in Mahoning and other counties, causing votes to be counted for the wrong candidate. White seeks injunctive relief, in the words of the district court, "to ensure Ohio voting machines function properly in the future and can be audited for accuracy." 235 F.R.D. 388, 389 (N.D. Ohio 2005). Over the Secretary's and Governor's objections, the district court granted White's motion to intervene. *Id.* at 390.

On November 14, 2005, the Secretary and Governor filed a second motion to dismiss. The Secretary and Governor contended that the League's and White's claims were now moot because the injunctive relief sought was framed in terms of "the next statewide general election" and a statewide election had occurred on November 8, 2005. The motion also argued that the complaint no longer sought prospective relief and that sovereign immunity therefore applied. The Secretary and Governor later moved to dismiss White's complaint as moot on similar grounds.

In response, the League argued that the complaint sought injunctive relief for future elections. Accordingly the League sought, and was granted, leave to file an amended complaint. The amended complaint, filed November 30, 2005, was identical to the original complaint except that the prayer for relief sought injunctive relief for "future statewide general elections."[7] White later filed an amended complaint reflecting the same changes made by the League in its amended complaint.

On December 2, 2005, the district court granted in part and denied in part the first motion to dismiss. 432 F. Supp. 2d 723 (N.D. Ohio 2005). First, the district court held that the League had stated a claim under 42 U.S.C. § 1983 for violation of equal protection. *Id.* at 727-28. Relying on *United States v. Mosley*, 238 U.S. 383, 386 (1915), *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), *Bush v. Gore*, 531 U.S. 98, 109 (2000), and *Ury v. Santee*, 303 F. Supp. 119 (N.D. Ill. 1969), the district court found that the League's allegations, if true, established that "defendants may be depriving citizens of the franchise depending on where they live in violation of the equal protection clause." *Id.* at 727. The district court rejected the Secretary's and Governor's arguments that the local county BOEs were the proper defendants, finding that any claim against the BOEs "does not bar a claim that, on a state-wide basis and under the supervision of state officials, Ohio's voting system breeds non-uniformity that defendants could and should correct." *Id.* at 728.

Second, the district court held that the League had stated a claim for violation of substantive due process. *Id.* at 728-30. The district court found that "[t]here is no question that [the League] has alleged actionable constitutional violations. What remains is whether [the Secretary and the Governor] are legally responsible for those violations." *Id.* at 728. Relying on *City of Canton v. Harris*, 489 U.S. 378, 387 (1989) and its progeny, the district court found that the Secretary and Governor "may be answerable for constitutional violations where state employees have not been trained adequately and that lack of training has caused constitutional wrongs" if they acted with deliberate indifference or willful blindness. *Id.* at 729. Further, the district court found that the League had pled sufficient facts to proceed on a failure to train theory.

---

[7]The amended complaint also deleted the allegations regarding Watanabe, Stewart, and Booker in light of the fact that they were no longer parties.

Third, the district court held that the League had stated a claim for violation of procedural due process on a failure to train theory. *Id.* at 730. Fourth, the district court held that the League had not stated a claim under HAVA because Ohio was not required to comply with HAVA until January 2006. *Id.* at 731. Accordingly, the district court granted the motion to dismiss the HAVA count and denied the motion to dismiss the § 1983 counts. *Id.* at 734. Addressing the remaining issues presented by the first motion to dismiss, the district court held that the Secretary and Governor are proper parties to this action; that the organizational plaintiffs have standing; that the League was not required to join the local BOEs as parties; that the claims are not barred by claim preclusion; and that venue is proper in the Northern District of Ohio. *Id.* at 731-34.

On December 7, 2005, the Secretary and Governor filed a third motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). The majority of the motion renewed various arguments made in the first motion to dismiss.

The following day, the Secretary and Governor sought leave to file an interlocutory appeal of the December 2 order pursuant to 28 U.S.C. § 1292(b). The district court granted in part and denied in part the motion for leave to take an interlocutory appeal. No. 3:05CV7309, 2006 WL 1580032 (N.D. Ohio Feb. 10, 2006). The district court agreed with the Secretary and Governor that (1) its denial of the motion to dismiss the § 1983 claims involves a controlling question of law; (2) there exists substantial ground for difference of opinion "with regard to whether plaintiffs' constitutional claims are cognizable," *id.* at *2;[8] and (3) immediate appeal would materially advance the ultimate termination of the litigation. Therefore, the court found that interlocutory appeal on that issue was warranted. The district court disagreed, however, that interlocutory appeal was appropriate on any of the other issues addressed in the December 2 order. Accordingly, the district court granted the motion for leave to appeal with respect to whether the League states a cause of action and denied the motion in all other respects. *Id.* at *3.

By separate order of the same date, the district court denied the third motion to dismiss. 432 F. Supp. 2d 734 (N.D. Ohio 2006). The district court held that its December 2 order was the law of the case. *Id.* at 738-39. Therefore, the district court rejected those arguments it had previously considered and overruled.[9] In the same order, the district court held that sovereign immunity does

---

[8]The district court wrote:

> This court remains confident its December 2nd Order follows naturally from established precedent. . . . If "one man, one vote" is to have meaning, it must encompass not only gerrymandered apportionment among legislative districts, but also other systemic, governmentally-endorsed or -maintained impediments to equal and unimpaired access to the ballot box. Nevertheless, there is substantial disagreement as to how I have platted this as yet largely unexplored constitutional territory; certainly no precedent compels one outcome over another. Consequently, there is substantial ground for disagreement with regard to whether plaintiffs' constitutional claims are cognizable.

2006 WL 1580032, at *2 (citations and footnote omitted). Further,

> [t]he dispute in this case involves fundamental issues of paramount importance as to which there is no controlling precedent clearly or directly on point, and as to which substantial disagreement not only about the merits, but the propriety of federal court intervention and the reach of such intervention can, and in my view, does exist.

*Id.* at *2 n.1.

[9]The district court also addressed, and rejected, the two new arguments raised by the third motion to dismiss: that the two-year statute of limitations under 42 U.S.C. § 1983 bars the League's claims to the extent that the allegations arose before July 28, 2003 and that some of the individual plaintiffs' claims were moot because they lacked a reasonable

not bar jurisdiction over the claims asserted here because the League alleges ongoing violations of federal law and seeks prospective relief only. *Id.* at 739-40. Anticipating that the Secretary and Governor would seek immediate appeal from its denial of the motion to dismiss on the basis of sovereign immunity, the district court certified the appeal as frivolous and retained jurisdiction over the case during the pendency of any such appeal. *Id.* at 740. The Secretary and Governor timely appealed from the February 10 orders.

Subsequently, the district court denied the motion to dismiss White's complaint for the reasons stated in its December 2 order. No. 3:05CV7309, 2006 WL 753118 (N.D. Ohio Mar. 23, 2006). Again, the Secretary and Governor timely appealed.

On May 1, 2006, the Secretary and Governor filed a fourth motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1). They argued that Ohio's passage of House Bill 3 ("H.B. 3") bars the conduct complained of and therefore moots the alleged violations of federal law.[10] The district court ordered discovery regarding H.B. 3 and held its decision regarding mootness in abeyance pending completion of discovery on that issue. As a result, the district court has not yet decided whether H.B. 3 moots the constitutional claims presented here.

On May 9, 2006, a motions panel of this court granted the Secretary's and Governor's petition for leave to appeal the December 2 order denying their motion to dismiss for failure to state a claim. The motions panel also granted the Secretary's and Governor's petition for leave to appeal the February 10 order denying their motion to dismiss on the basis of sovereign immunity. Proceedings in the district court were stayed pending the sovereign immunity appeal.[11] The resulting cases were consolidated into this interlocutory appeal.

## II.

At the threshold, the Secretary and Governor argue that this court lacks jurisdiction because the claims presented are moot. A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *L.A. County v. Davis*, 440 U.S. 625,

---

basis to believe the violations alleged would recur. 432 F. Supp. 2d at 740-41.

[10]As characterized by the Secretary and Governor, H.B. 3

> institutes a statewide registration system under which (a) voter identification is required with applications for registration and notices of registration specifically inform voters of that requirement; (b) applicants are permitted to register through any board of elections or through the Secretary of State's office; (b) voters whose applications are received more than 30 days before an election are assured that they will be registered to vote in that election; (d) voter registration lists are prepared 14 days before each election and are available for public inspection; (e) registration lists are periodically purged of ineligible voters; (f) a statewide voter registration database is maintained and each board of elections is authorized to modify it; (g) voters may search the statewide database; (h) disabled voters may, among other things, vote with the assistance of an "attorney in fact"; (i) voters who have requested absentee ballots may cast provisional ballots; (j) authorizes 14 separate categories of voters who are eligible for provisional voting; and (k) every board of elections is subject to strict guidelines concerning voting machines and the minimum number of direct recording electronic voting machines in a county is further refined.

The full text of H.B. 3 is available at http://www.legislature.state.oh.us/BillText126/126_HB_3_EN_N.html (last visited Nov. 21, 2008).

[11]The district court had previously denied the Secretary's and Governor's motion for a stay pending the sovereign immunity appeal. 432 F. Supp. 2d 742 (N.D. Ohio 2006).

631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Mootness implicates Article III's "case or controversy" requirement. *Gentry v. Deuth*, 456 F.3d 687, 693 (6th Cir. 2006). Accordingly, mootness can be raised at any stage of litigation because it is a jurisdictional requirement. *See Midwest Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 460 (6th Cir. 2007).[12]

A defendant's "voluntary cessation of a challenged practice" does not moot a case. *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000)); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342-43 (6th Cir. 2007). Rather, voluntary conduct moots a case only in the rare instance where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) (citation omitted). What is more, the party asserting mootness bears the "'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (quoting *Jones v. City of Lakeland*, 224 F.3d 518, 529 (6th Cir. 2000)); *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). However, government officials receive "more solicitude" on this point than do private parties. *Ammex*, 351 F.3d at 705.

In their brief, the Secretary and Governor focused on the passage of H.B. 3 to support their argument that the claims presented are moot. At oral argument, they pointed to several recent directives issued by the Secretary for further support. Both arguments miss the mark. Presumably, it was never the law or official policy of the State of Ohio to deny Ohioans access to the franchise. Rather, the constitutional violations alleged stem from the Secretary's and Governor's failure to prevent and correct the system-wide chaos that is alleged to have occurred in November 2004, and perhaps as far back as 1971. It is hard to see how the voluntary passage of legislation[13] or issuance of directives can moot claims such as these. Therefore, the Secretary and Governor have not met their heavy burden of persuasion on the record now before us.[14] For the same reasons, their argument that the passage of H.B. 262, which provides for verified paper audit trails for touchscreen voting machines, moots White's complaint is without merit.

### III.

Next, the Secretary and Governor argue that they are immune from suit under the Eleventh Amendment. The district court rejected this argument and certified the resultant appeal as frivolous. We consider this question of constitutional law *de novo*. *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008); *S.J. v. Hamilton County*, 374 F.3d 416, 418 (6th Cir. 2004).

The Eleventh Amendment generally bars suits by citizens of a state against a state in federal court. U.S. Const. amend. XI; *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008). There are, however, numerous exceptions to this rule. *Ernst v. Rising*, 427 F.3d 351, 358-59 (6th Cir. 2005)

---

[12]The League argues that the mootness issue is not properly before this court because the motion to dismiss for mootness is currently pending before the district court. Because mootness poses a jurisdictional bar, however, we are required to consider it. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001).

[13]The Help America Vote Act of 2002 ("HAVA") provides federal funding for elections to those states that comply with its requirements. 42 U.S.C. § 15301(a). In response to HAVA, Ohio enacted H.B. 3 on May 2, 2006. *See supra* note 10 (summarizing relevant provisions of H.B. 3). Ohio's compliance with HAVA is voluntary. *See* 42 U.S.C. § 15301.

[14]The district court has ordered discovery on this issue and will issue its decision once discovery is complete. It may be that the Secretary and Governor can make a factual showing that the challenged conduct cannot reasonably be expected to recur.

(*en banc*).  One exception applies when a state official is sued in his official capacity for purely injunctive relief.  *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 654 n.8 (6th Cir. 2007).

The test for determining whether the *Ex parte Young* exception applies is a "straightforward" one.  *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  The court considers "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Id.* (alteration in original) (citation omitted); *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003).  The focus of the inquiry remains on the allegations only; it "does not include an analysis of the merits of the claim."  *Verizon*, 535 U.S. at 646; *Dubuc*, 342 F.3d at 616.

The Secretary and Governor argue that the *Ex parte Young* exception is not applicable here because the League "fail[s] to allege ongoing constitutional violations."  Specifically, they point to excerpts from deposition testimony[15] to attempt to show that none of the plaintiffs has a reasonable basis to believe the violations will occur in the future.  This approach is contrary to *Verizon*, which limits the inquiry to the complaint.

The amended complaint falls comfortably within the *Ex parte Young* doctrine.  The League alleges that Ohio's election machinery unconstitutionally denies or burdens Ohioans' right to vote based on where they live in violation of the Equal Protection Clause.  Additionally, the League alleges that top state officials have displayed willful indifference to Ohioans' fundamental right to vote by failing to train poll workers in violation of the Due Process Clause.  The League alleges that these problems are chronic and will continue absent injunctive relief.  Finally, the League properly characterizes its prayer for relief as prospective.  Therefore, the Eleventh Amendment offers no immunity to the defendants.[16]

IV.

Turning to the merits, we must consider whether the amended complaint states a claim under 42 U.S.C. § 1983 for violations of equal protection, substantive due process, and procedural due process.  The district court held that it did, and we review those findings *de novo*.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  "We must construe the complaint in a light most favorable to the plaintiffs."  *Ley v. Visteon Corp.*, 540 F.3d 376, 380 (6th Cir. 2008).  Although we "must accept as true 'well-pleaded facts' set forth in the complaint," *id.*, we are "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

Under the Federal Rules of Civil Procedure, a complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (*per curiam*); *Sensations, Inc. v. City of Grand*

---

[15] A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction may refer to the evidence without converting the motion into one for summary judgment.  *Ernst*, 427 F.3d at 372.

[16] The Secretary and Governor also maintain that they are not proper parties to this action in that any alleged errors were the fault of local BOEs rather than high-level state officials.  The district court properly rejected this argument.  The Secretary of State of Ohio is the state's chief election officer *ex officio*.  Ohio Rev. Code § 3501.04; *see, e.g.*, *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) (*per curiam*).  The Governor of Ohio is the state's chief executive officer.  Ohio Const. art. III, § 5; *see Lawson v. Shelby County*, 211 F.3d 331, 335 (6th Cir. 2000) (holding that governor was proper defendant in suit for prospective injunctive relief alleging denial of the plaintiffs' right to vote); *see generally Young*, 209 U.S. at 157.  Both officials have the authority to control the BOEs and are proper parties here.

*Rapids*, 526 F.3d 291, 296 (6th Cir. 2008). The same standard applies to claims under 42 U.S.C. § 1983. *Dubay v. Wells*, 506 F.3d 422, 427 (6th Cir. 2007).

A.

A claim under 42 U.S.C. § 1983 has two elements: "'(1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law.'" *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008) (quoting *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). The defendants do not dispute the first element. This case, therefore, turns on whether the League and White have made out the second element of their § 1983 claim: violation of their constitutional rights.

B.

First, the League argues that Ohio's voting system arbitrarily denies its citizens the right to vote or burdens the exercise of that right based on where they live–"county to county, city to city, and precinct to precinct." These disparities are alleged to violate the Equal Protection Clause.

Although allegations of mere negligence will not sustain an action under § 1983, the statute "contains no independent state-of-mind requirement." *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Howard v. Grinage*, 82 F.3d 1343, 1350 (6th Cir. 1996). Rather, when litigating under § 1983, the plaintiff must prove the culpable mental state applicable to the underlying constitutional right. *Daniels*, 474 U.S. at 330; *Howard*, 82 F.3d at 1350. The Secretary and Governor argued in the district court, and before us, that the equal protection claim requires a showing of "intentional and purposeful discrimination." The League contends that the proper scienter requirement is, alternatively, knowledge, willful blindness, or deliberate indifference. We need not decide this issue, however, because the only question before us is whether the amended complaint pleads facts, if proven, sufficient to establish that the defendants arbitrarily deny Ohioans the right to vote depending on where they live. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (*per curiam*) ("Having once granted the right to vote on equal terms, the State may not, by later *arbitrary and disparate* treatment, value one person's vote over that of another." (emphasis added)); *Reynolds v. Sims*, 377 U.S. 533, 557 (1964) (noting that "arbitrary and capricious action" can violate the Fourteenth Amendment (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962))); *see also League of Women Voters v. Fields*, 352 F. Supp. 1053 (E.D. Ill. 1972); *Ury v. Santee*, 303 F. Supp. 119, 126 (N.D. Ill. 1969). We find that it does.

The right to vote is a fundamental right, "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). The right to vote includes the right to have one's vote counted on equal terms with others. *Bush*, 531 U.S. at 104 ("[T]he right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter."); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Reynolds*, 377 U.S. at 567-68; *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964); *Gray v. Sanders*, 372 U.S. 368, 380 (1963) ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."); *United States v. Classic*, 313 U.S. 299, 315 (1941); *United States v. Mosley*, 238 U.S. 383, 386 (1915); *see also* U.S. Const. amends. XV, XIX, XXIV, XXVI.

The Supreme Court recently reaffirmed these principles:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Bush*, 531 U.S. at 104-05 (internal citations and quotations omitted).

*Bush* arose out of the 2000 presidential election. The Supreme Court of Florida ordered a manual recount of ballots cast in Miami-Dade County as well as certain other Florida counties. *Bush*, 531 U.S. at 102. The Supreme Court reversed, holding that "the use of standardless manual recounts" violates the Equal Protection Clause. *Id.* at 103. The Court reasoned that the lack of statewide standards effectively denied voters the fundamental right to vote. *Id.* at 105. At a minimum, the Court held, equal protection requires "nonarbitrary treatment of voters." *Id.*

Although *Bush* was necessarily "limited to the present circumstances," *id.* at 109, district courts have found its analysis applicable in challenges to voting systems. *See, e.g.*, *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002) (holding that plaintiffs had stated an equal protection claim where they alleged that votes in some counties were statistically less likely to be counted than votes in other counties); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones*, 213 F. Supp. 2d 1106, 1108-10 (C.D. Cal. 2001) (holding that defendants were not entitled to judgment on the pleadings where plaintiffs alleged that some counties adopted more reliable voting procedures than others in violation of equal protection). Likewise, we find it relevant here.

*Ury v. Santee*, 303 F. Supp. 119, decided thirty years before *Bush*, involved an equal protection challenge to a local election in Wilmette, Illinois. The district court made the following findings of fact:

> On election day, April 15, 1969, qualified voters who desired to vote were forced to wait unreasonable lengths of time to obtain and cast their ballots in certain of the precincts . . . as a result of the consolidation of 32 precincts into six precincts, because of the assignment of excessive numbers of registered voters to the precincts, the establishment of inadequate voting facilities and the failure to provide sufficient numbers of judges to service such polling places. In many instances voters . . . were required to wait for periods of two to four hours to cast their ballots and were forced to attempt to vote three, four, and, in one instance, five times, and were otherwise hindered in their right to cast ballots by reason of the excessively crowded conditions at the polling places and their environs.

*Id.* at 124. On these facts, the district court held that the overcrowded conditions effectively deprived the plaintiffs of the right to vote.

The League alleges facts similar to, and more egregious than, those presented in *Ury*. Voters were forced to wait from two to twelve hours to vote because of inadequate allocation of voting machines. Voting machines were not allocated proportionally to the voting population, causing more severe wait times in some counties than in others. At at least one polling place, voting was not completed until 4:00 a.m. on the day following election day. Long wait times caused some voters to leave their polling places without voting in order to attend school, work, or to family responsibilities or because a physical disability prevented them from standing in line. Poll workers

received inadequate training, causing them to provide incorrect instructions and leading to the discounting of votes. In some counties, poll workers misdirected voters to the wrong polling place, forcing them to attempt to vote multiple times and delaying them by up to six hours. Provisional balloting was not utilized properly, causing 22% of provisional ballots cast to be discounted, with the percentage of ballots discounted reaching 39.5% in one county. Disabled voters who required assistance were turned away. White alleges that the touchscreen voting machine "jumped" from her preferred candidate to another candidate, possibly causing her vote to be counted for the wrong candidate. If true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right depending on where they live in violation of the Equal Protection Clause.

C.

Second, the League argues that Ohio's voting system violates the Due Process Clause because it is so unfair as to deny or severely burden Ohioans' fundamental right to vote. The Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair. *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1971); *see, e.g.*, *Black*, 209 F. Supp. 2d at 900-01; *Ury*, 303 F. Supp. at 126. The First Circuit has noted that federal court intervention may be appropriate in a challenge to "the fairness of the official terms and procedures under which the election was conducted. [However, t]he federal courts [should not be] asked to count and validate ballots and enter into the details of the administration of the election." *Griffin*, 570 F.2d at 1078.

The allegations here, if true, may present the exceptional case. The League is not asking, for example, for a recount of the 2004 electoral results. Rather, the League alleges that Ohio utilizes "non-uniform rules, standards, and procedures" that result in "massive disenfranchisement and unreasonable dilution of the vote." The League supports these conclusions with specific factual allegations. For example, registered voters were denied the right to vote because their names were missing from the rolls. Inadequate provision of voting machines caused 10,000 Columbus voters not to vote. Poll workers improperly refused assistance to disabled voters. Provisional ballots were not distributed to appropriate voters, causing voters to be denied the right to vote. At the same time, provisional ballots were provided to other voters without proper instructions, causing 22% of provisional ballots cast to be discounted. These allegations, if true, could support a troubling picture of a system so devoid of standards and procedures as to violate substantive due process.

White alleges that touchscreen voting machines at her polling place malfunctioned, causing her vote to "jump" from her chosen candidate to another candidate. She further alleges that this problem affected "significant numbers" of voters "due to the promulgation and maintenance of non-uniform rules, standards, procedures, and training of election personnel throughout Ohio." White, too, can state a claim for violation of substantive due process.

D.

That Ohio's voting system impinges on the fundamental right to vote does not, however, implicate procedural due process, as alleged in count three of the amended complaint. The League contends that Ohio's voting system deprives Ohioans of "their liberty interest in voting and does so without adequate pre- or post-deprivation process." However, the League has not alleged a constitutionally protected interest. The brevity of argument in the League's brief–which subsumes procedural due process into the substantive due process analysis–reflects the lack of authority for this position. Accordingly, count three of the complaint is dismissed.

V.

For the foregoing reasons, we affirm in part and reverse in part, leaving the League's and White's equal protection and substantive due process claims to proceed in the district court.