Brett McCLAFFERTY, Plaintiff,

v.

**PORTAGE COUNT BOARD OF ELECTIONS, et al., Defendants.**

**Case No. 5:09CV2210.**

United States District Court, N.D. Ohio, Eastern Division.

Sept. 30, 2009.

Avery S. Friedman, Friedman & Associates, Cleveland, OH, for Plaintiff.

## MEMORANDUM OPINION

SARA LIOI, District Judge.

On September 24, 2009, Plaintiff Brett McClafferty (Plaintiff or McClafferty) filed a complaint (Doc. No. 1) against Defendants Portage County Board of Elections (Board) and City of Streetsboro (City) (collectively Defendants), along with a motion seeking a temporary restraining order and a preliminary injunction (Doc. No. 2). The Court conducted a telephonic status conference with counsel for the parties shortly after the lawsuit was filed. At the conclusion of the conference, the Court scheduled a hearing for September 29, 2009.[1] In light of the expedited schedule for the hearing, Plaintiff withdrew his motion for a temporary restraining order. (*See* Doc. No. 4.)

The court conducted the preliminary injunction hearing, as scheduled, on September 29, 2009, during which counsel offered oral argument and made proffers as to witness testimony. The parties also entered into various factual stipulations, and these stipulations were read into the record. After considering the issues raised in the motion, the Court hereby finds that Plaintiff has failed to meet the burden necessary to obtain preliminary injunctive relief. For the reasons explained in this Memorandum Opinion, the motion is hereby **DENIED.**

## I. Background

Plaintiff is a 21 year old resident of the City of Streetsboro.[2] In May 2007, when Plaintiff was 19 years of age, he ran for the office of Mayor of Streetsboro.[3] The primary race was close (Stipulations at ¶ 8), and McClafferty came within one vote of advancing to the general election. (Compl. at ¶ 8.) In the general election that followed in November 2007, Thomas Wagner was elected Mayor. (Stipulations at ¶ 9.) It is undisputed that Mr. Wagner's term was to have expired in 2011. (Stipulations at ¶ 10.)

According to Plaintiff, the support he received in the 2007 primary and his "popularity sent shockwaves through the Streetsboro political establishment." (Mot. at 3.) Plaintiff believes that City officials immediately dedicated City resources to finding a way to prohibit him seeking political office in the future.

In 2007, a "Charter Review Commission" was constituted to serve from March 26, 2007 through June 26, 2007.[4] (Stipulations at ¶ 15.) Plaintiff maintains that "[o]lder citizens were appointed by [City] officials [to the charter review commission], which had the intent of looking for [a] way to restrict McClafferty from future eligibility to run for public office." (Compl. at ¶ 9.)

While Plaintiff suggests that political leaders in Streetsboro "immediately scrambled to throw together [the charter review commission]," (Mot. at 3), the undisputed facts reveal that the charter re-

1. The Court was prepared to conduct the hearing on September 28, 2009, but agreed to delay the hearing one day to accommodate a request by Plaintiff's counsel.

2. Plaintiff was born on March 9, 1988. (Stipulations at ¶ 1.)

3. At time of the election, the age restriction for running for political office in Streetsboro was 18 years.

4. Plaintiff asserted in his motion that the charter review commission was constituted in May 2007, following the election. Plaintiff is incorrect. The parties have since stipulated, however, that the commission was convened in March 2007, prior to the election. (Stipulations at ¶ 14.)

view commission was actually established in 1977, and that every five years the Mayor is required to appoint qualified electors, who do not hold public office, to the commission. (Doc. No. 6, Ex. 4, Streetsboro City Charter art. XVII, § 17.01.) It is undisputed that the commission was scheduled to convene in 2007. (*See* Stipulations at ¶ 11.) Once convened, the commission is required to submit to the board of elections by August 1st of the same year its proposed amendments, alterations and revisions to the City Charter. (*Id.* at § 17.03; Stipulations at ¶ 12.)

On June 27, 2007, the charter review commission issued its recommendations to amend the City Charter by revising the qualifications for the office of mayor. Specifically, the proposed amendment to Section 3.02 added three new requirements: (1) "that the Mayor shall have been for at least two (2) years prior to the date of his or her election [ . . . ] a continuous resident and qualified elector of [the City]"; (2) he or she "shall have attained the age of 23 years prior to the date of his or her election;" and (3) that all candidates for this office "shall complete and file with the Council clerk a criminal conviction disclosure form."[5] (Charter art. III, § 3.02.) The Commission proposed the same amended qualifications for applicants seeking a position on the City Council. (*Id.*, art. IV, § 4.03.)

At the time the charter review commission issued its 2007 recommendations, the next mayoral election was not due to take place until 2011, when Mayor Wagner would have completed his term. (Stipulations at ¶ 10.) The record shows that, even under the commission's proposed amendments, Plaintiff would have been eligible to run for mayor in 2011.[6]

Plaintiff alleges that in June 2007, the charter review commission sought guidance from the City's then law director, Chad Murdock, on the propriety of the new amendments. (Compl. at ¶ 14.) The law director purportedly informed the charter review commission that the 23 age restriction was "arbitrary" and that it would be "tough to make the argument that age was directly related to qualifications, i.e., they could have an eligible 23 year old drop out but an ineligible 22 year old college graduate of public administration." (*Id.* at ¶ 15.)

Notwithstanding the law director's concern, the Streetsboro City Council approved and adopted Ordinance No. 2007–88, which contained the new restrictions on mayoral qualifications in Section 3.02, and the city council qualifications in Section 4.03. (Compl. at ¶ 17, Ex. B, Ordinance No. 2007–88; Stipulations at ¶ 18.) The Portage County Board of Elections reviewed the City's proposed ballot for the 2007 Charter amendments and forwarded same to the Ohio Secretary of State for review. (Stipulations at ¶ 19.) "Prior to November 2007, the Ohio Secretary of

---

5. The criminal conviction form "shall require each candidate to identify and describe any misdemeanor theft or any felony conviction (or expungement of either) he or she has had in their life, if any. The form shall be prepared and available through the Mayor's office. The completed form shall be open to public inspection." (Charter art. III, § 3.02.)

6. At the preliminary injunction hearing, Plaintiff, through counsel, suggested that he would not have been eligible under the new requirements to seek office in 2011 because his birthday, March 9, 1988 (Stipulations at ¶ 1), fell after the date for filing petitions for candidacy. This is inaccurate. Section 3.02, as ultimately amended, provides that a candidate's age, for purposes of qualification for mayor, is to be determined by the age the candidate would be "prior to the date of his or her election." Charter art. III, § 3.02. Plaintiff would have turned 23 prior to the November 2011 election.

State did review and approve the City's ballot language for the 2007 Charter amendments." (*Id.* at ¶ 20.)

The proposed amendment appeared on the ballot as follows:

### 21 PROPOSED CHARTER AMENDMENT CITY OF STREETSBORO

A Majority Affirmative Vote is Necessary for Passage.

SHALL THE PROPOSED AMENDMENT OF THE CHARTER OF THE CITY OF STREETSBORO AS PROPOSED BY ORDINANCE NO. 2007–88 WHICH WOULD REVISE AND ADD TO SECTIONS 3.02, QUALIFICATIONS (MAYOR), AND 4.03, QUALIFICATIONS (COUNCIL), TO REQUIRE COMPLETION OF A CRIMINAL CONVICTION DISCLOSURE FORM FOR ALL CANDIDATES, TO REDUCE THE CITY RESIDENCY AND QUALIFIED ELECTOR REQUIREMENTS TO TWO (2) YEARS, AND TO ESTABLISH A MINIMUM AGE REQUIREMENT OF TWENTY–THREE (23) YEARS, BE ADOPTED?

(Doc. No. 1, Ex. 3, 2007 Ballot.) Plaintiff represents that it is significant to the present motion that, despite the fact that the criminal conviction disclosure appeared last in the recommendations made by the charter review commission, it was listed as the first proposed qualification on the ballot. Issue 21, the amendments to Section 3.02 and 4.03, passed by a majority vote, and the amended language was incorporated into the City Charter, effective immediately after passage.

In April, 2009, Mayor Wagner resigned his office, less than half-way through his four-year term. (Stipulations at ¶¶ 4, 24.) The Streetsboro City Council "appointed an interim Mayor to preside over the Office until a special election could be held in November 2009 [. . .]." (*Id.* at ¶ 25.)

In February 2009, Plaintiff initiated a petition drive in preparation for his bid to, once again, run for mayor; this time, in the special election occasioned by Mayor Wagner's resignation. (Compl. at ¶ 31.) After securing the required signatures, Plaintiff submitted his petition for certification to the Board. (*Id.* at ¶ 33.) On August 27, 2009, the Board refused to certify Plaintiff's candidacy because he failed to meet the new age requirement for mayor, as set forth in the revised version of Section 3.02. (*Id.* at ¶ 34; Stipulations at ¶ 27.)

Plaintiff lodged a formal objection, and the Board granted him a hearing, which took place on September 3, 2009. (Stipulations at ¶ 28.) During the hearing, Plaintiff argued that Section 3.02 was unconstitutional, and urged the Board to reconsider its refusal to certify his candidacy. (Compl. at ¶ 36.) The Board determined that it lacked the authority to pass on the constitutionality of Section 3.02, (*Id.* at ¶ 37), and affirmed its decision to reject Plaintiff's request to have his candidacy certified. (Stipulations at ¶ 29.)

On September 24, 2009, Plaintiff commenced the instant lawsuit, alleging civil rights infringements under 42 U.S.C. § 1983. He seeks preliminary and permanent injunctive relief, declaratory relief in the form of a determination that Section 3.02 is unconstitutional, attorneys' fees, and costs. Simultaneous with the filing of the complaint, Plaintiff moved for a temporary restraining order and a preliminary injunction. Plaintiff withdrew his request for a TRO, and proceeded with his request for preliminary injunctive relief.[7] In his

---

7. The Court inquired as to whether Plaintiff wished to consolidate his motion for a preliminary injunction with a trial on the merits, as

motion, Plaintiff maintains that the age restriction contained in Section 3.02 violates his right to due process under the Fourteenth Amendment. He also argues that the Board, acting under color of law, intentionally "distorted the legislative wording of Ordinance No. 2007–88" by "flipping" the new requirements for mayor for the sole purpose of ensuring that Plaintiff would be unable to run for office. Having afforded the parties an opportunity to brief the issues, and having conducted a hearing on the motion for a preliminary injunction, the Court is ready to issue its decision.

## II. Standard of Review

The burden is on Plaintiff to demonstrate entitlement to preliminary injunctive relief, and it is a heavy one. Preliminary relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion [ . . . ]." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000). Ultimately, the decision to grant or deny preliminary injunctive relief rests within the discretion of the district court. *Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998); *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1393 (6th Cir.1987).

Consideration of whether to grant a preliminary injunction is governed by four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir.2004); *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir.1997) (en banc). The four factors are not prerequisites, but are interrelated considerations that must be balanced against each other. *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.1991); *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994). The first factor—the likelihood of success—is, however, the predominant concern. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997)).

To establish a likelihood of success, a plaintiff cannot prevail by showing that success on the merits is merely possible, *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n. 4 (6th Cir.1977), but instead must demonstrate that it is a "strong" or "substantial" likelihood. *See Summit County Democratic Cent. & Executive Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir.2004). The plaintiff need not show that success is assured, but must "at a minimum, show[ ] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir.1997) (citations and internal quotation marks omitted).

provided for in Fed.R.Civ.P. 65(A)(2), but

Plaintiff was unwilling to do so.

## A. *Likelihood of Success on the Merits*

### 1. *Age Restrictions*

■ McClafferty appears to concede that Section 3.02 does not violate the Equal Protection Clause based on his interpretation of the Sixth Circuit's holding in *Manson v. Edwards*, 482 F.2d 1076 (6th Cir.1973). However, McClafferty also argues that Section 3.02 "discriminates against citizens on account of an immutable quality, age." (Motion at 11) As the Equal Protection Clause guarantees that similar individuals will be dealt with in a similar manner by the government, McClafferty's argument clearly, if inartfully, raises Equal Protection arguments.

The Fourteenth Amendment does not require a state to treat all people identically. State or local legislation, even though discriminatory, "generally will not be held violative of the equal protection clause where it can be shown that the classification bears some rational relationship to a legitimate state objective." *Manson v. Edwards*, 482 F.2d 1076, 1077 (6th Cir. 1973) (citing *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Robinson v. Board of Regents*, 475 F.2d 707 (6th Cir.1973). However, this "rational basis" test is not used to evaluate every classification under the Equal Protection Clause. Certain classifications, such as those based on race or alienage, are evaluated with "strict scrutiny" because the classifications are inherently suspect. *See Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Yet other classifications, such as those based on illegitimacy and sex, are evaluated under a form of "intermediate scrutiny," because they are considered quasi-suspect. *See United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996);

*Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

Equal Protection is "not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (U.S.1993). Rather, a classification that does not differentiate based on suspect or quasi-suspect lines or infringe upon a fundamental constitutional right "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* Equal Protection is offended "only if the classification rests on grounds wholly irrelevant to the achievement of the State's [or local government's] objective [ . . . ] a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (U.S. 1961).

While McClafferty analogizes Section 3.02's age-based differentiation to the race-based differentiations found unconstitutional in *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the law clearly does not support his conclusion that distinctions made on the basis of age should be evaluated on the same basis as distinctions made on the basis of race. Rather, the Sixth Circuit's decision in *Manson* is more analogous. In *Manson*, a 21 year old man attempted to file as a candidate for the office of councilman in the city of Detroit. *Manson*, 482 F.2d at 1077. Detroit's city charter established a minimum age of twenty-five years for the office of City Councilman, and Manson and three registered voters who alleged a desire to vote for him challenged the constitutionality of that provision. *Id.* at 1076–77. The court in *Manson* determined that rational basis review applied to the charter

provision because, in part, differentiations based on classification by age are not viewed as suspect or quasi-suspect. *Manson*, 482 F.2d at 1077. *See also Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (finding classification by age does not define a discrete and insular group in need of extraordinary protection from the majoritarian political process).

Further, the court in *Manson* noted, "the prescribing of minimum ages for public officials is sanctioned by time-honored precedent." *Manson*, 482 F.2d at 1078. It is particularly appropriate "to apply a deferential standard of review to age requirements affecting young people because such requirements do not result in an absolute prohibition but merely postpone the opportunity to engage in the conduct at issue." *Stiles v. Blunt*, 912 F.2d 260, 265 (8th Cir.1990).

Thus, unless Section 3.02 infringes upon a fundamental constitutional right, *see FCC v. Beach Communications, supra*, it will be upheld unless it bears no rational relationship to a legitimate state objective. Before turning to the analysis of whether Section 3.02 implicates a fundamental constitutional right under the equal protection clause, however, the Court will briefly address McClafferty's claim that *Manson* is distinguishable because it "was decided solely on equal protection grounds without any argument advanced by the plaintiff about due process implications." (Mot. at 12.)

■ The Court first notes that the Supreme Court has held that the concept of substantive due process has no place when another provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *see also Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (explaining the dangers of overextending substantive due process protections). "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright*, 510 U.S. at 273, 114 S.Ct. 807 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In *Albright*, the Supreme Court held that a petitioner could not be afforded relief for a violation of his Fourth Amendment rights against unreasonable search and seizure under the substantive component of the due process clause when the Fourth Amendment provided an explicit textual source of constitutional protection. In *Montgomery v. Carter County, Tenn.*, 226 F.3d 758 (6th Cir.2000), the Sixth Circuit suggested that because the Fifth Amendment addressed governmental takings, "no room is left for the concept of substantive due process" in the analysis of plaintiff's claims of unconstitutional governmental takings. *Id.* at 769; *see also Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 464 (7th Cir.1988) (suggesting that the negative implications of the takings clause itself, rather than the concept of substantive due process, forbid takings for solely private uses).

Further, and directly applicable to this case, "[n]umerous courts have held that where the party's substantive due process claim is based on alleged acts of discrimination, that claim should be analyzed under the framework of the Equal Protection Clause rather than as a substantive due process claim." *Fernandez v. City of Pataskala*, No. 2:05–cv–75, 2006 WL 3257389, at *2, 2006 U.S. Dist. LEXIS 82136, at *6 (S.D.Ohio Nov. 9, 2006). *See, e.g., Eby–Brown Co., LLC v. Wisconsin Dep't of Agriculture*, 295 F.3d 749, 754 (7th Cir.

2002) (claims of alleged unequal treatment properly analyzed under the Equal Protection Clause, not as substantive due process claims); *Yassini v. City of Sunnyvale,* 103 F.3d 143 (table), [published in full-text format at 1996 U.S.App. LEXIS 32929], (9th Cir.1996) (claim concerning validity of ordinance covered by explicit constitutional provisions protecting equal protection, precluding relief on substantive due process theory); *Gehl Group v. Koby,* 63 F.3d 1528, 1539 (10th Cir.1995) (claims regarding alleged racially discriminatory animus should be analyzed under explicit guarantees of Equal Protection Clause), *implicitly overruled on other grounds by Currier v. Doran,* 242 F.3d 905, 916 (10th Cir. 2001); *National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.1995) (economic regulations evaluated under equal protection principles rather than as a substantive due process claim); *Curry v. Pulliam,* 234 F.Supp.2d 921, 927 (S.D.Ind.2002) (holding that plaintiff who alleged race discrimination in the termination of his employment had no substantive due process claim because he had alleged a violation of the Equal Protection Clause); *Hogan v. State of Connecticut Judicial Branch,* 220 F.Supp.2d 111, 123 (D.Conn.2002) (substantive due process claim alleging race discrimination in termination of employment "should be analyzed exclusively under the law of equal protection, not substantive due process.").

Given the weight of authority cited above, and in light of Judge Graham's thoughtful analysis in *Fernandez,* this Court finds to the extent Plaintiff claims that Section 3.02 violates the substantive component of the due process clause because the age restriction contained therein infringes upon a fundamental constitutional right, it should be analyzed exclusively under the law of equal protection. Furthermore, even if the Court were to analyze the alleged infringement under the substantive due process clause, the analy-

sis is identical to that under the equal protection clause.

 The substantive component of the Due Process Clause protects "fundamental rights" that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Conn.,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Such rights include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997). Legislation that infringes on a fundamental right is reviewed under the strict-scrutiny test and will be invalidated unless it is "narrowly tailored to serve a compelling state interest." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1184, 170 L.Ed.2d 151 (2008). However, statutes that do not implicate a plaintiff's fundamental rights are evaluated by utilizing a rational-basis standard of review. *Doe v. Mich. Dep't of State Police,* 490 F.3d 491, 501 (6th Cir.2007). Thus, the inquiry under the equal protection clause and the due process clause is the same with respect to whether or not the age restriction contained in Section 3.02 infringes upon a fundamental constitutional right.

 First, the Court must specifically identify the right that the age restriction contained in Section 3.02 allegedly infringes upon. In this case, Section 3.02, as adopted in the relevant part, requires as a qualification to become mayor the attainment of the age of 23 years prior to the date of election. This is not a restriction on the right to vote, but rather, a restriction on the candidacy of those individuals who will not yet be 23 years old by the election date. The distinction is impor-

tant, because while the right to vote is a fundamental constitutional right, the Supreme Court "has never recognized a fundamental right to express one's political views through candidacy." *Carver v. Dennis,* 104 F.3d 847, 850–851 (6th Cir.1997) (citing *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)). *See also American Constitutional Law Foundation, Inc. v. Meyer,* 120 F.3d 1092, 1101 (10th Cir.1997) ("candidacy is not a fundamental right."); *N.A.A. C.P., Los Angeles Branch v. Jones,* 131 F.3d 1317, 1324 (9th Cir.1997) ("[c]andidates do not have a fundamental right to run for public office."); *Hatten v. Rains,* 854 F.2d 687, 693 (5th Cir.1988) ("[t]here is no fundamental right to be a candidate."); *but see Magill v. Lynch,* 560 F.2d 22 (1st Cir.1977) ("[c]andidacy is a First Amendment freedom."). Further, the Supreme Court has held that the existence of barriers to candidates' access to a state primary ballot does not compel close scrutiny, which supports a conclusion that there is no fundamental right to run for office. *See Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Nor is there a fundamental right to public employment. *See Snowden v. Hughes,* 321 U.S. 1, 7, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

In sum, the Court concludes that because Section 3.02 neither implicates a fundamental right under either the equal protection or the due process clauses nor makes a differentiation according to a suspect or quasi-suspect class, application of the rational basis level of scrutiny is appropriate. Rational basis scrutiny only requires a state of facts that provide a conceivable basis for the classification. *See Allied Stores v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). To withstand constitutional review, the classification simply must be rationally related to the goal or purpose of the classification. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981).

■ Having determined that the rational basis test is appropriate here, the Court has little trouble in conceiving legitimate interests that are served by the minimum age requirement. The City of Streetsboro has a legitimate interest in insuring that its Mayor has some degree of maturity and life experience and the minimum age requirement is a legitimate means of accomplishing this objective. *See Stiles,* 912 F.2d at 267 (upholding Missouri's statutory requirement that state representatives be at least 24 years of age under rational basis review). Further, whether or not these reasons were actually considered in enacting the minimum age requirement is irrelevant. *Zielasko,* 873 F.2d at 961. *See also Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) ("[ . . . ] it is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . ."); *Breck v. Michigan,* 203 F.3d 392, 396 (6th Cir.2000) ("whether the identified legitimate state interests were actually considered in establishing the prohibition is irrelevant.").

It is true that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The relationship between establishing a minimum age and furthering the legitimate interest of ensuring the mayor has some degree of maturity and life experience, however, is surely related. Thus, the Court is not persuaded by McClafferty's argument that choosing 23 as the minimum age to be mayor is arbitrary and irrational. McClafferty argues that it is "illogical and absurd" to think that a "22–year–old with two tours of

duty in Iraq is less 'experienced' to be an elected official in Streetsboro than a 23–year–old high-school dropout living at home with his parents." This very well may be true, but it is irrelevant to the inquiry. This Court is not permitted to substitute its own view in this matter. Whether the minimum age for the Mayor of Streetsboro should be 18, 23, or 30 is not for this Court to decide and is "a classic example of legislative line-drawing that we must leave undisturbed." *See Stiles*, 912 F.2d at 267.

The Court is also not persuaded by McClafferty's implication that the Board acted only out of a personal animus towards him. While it is true that the Board acted soon after his failed 2007 mayoral campaign, it does not necessarily follow that "nothing [else] existed in the history of the City of Streetsboro to conjure up a proposed increased age restriction." (Complaint at ¶ 20.) McClafferty's own Complaint cites the reasoning of charter review commission member Jean Henzel, who "cited an 18–year–old Streetsboro councilman who quit after two years because he moved to Kent, ran and won in Kent, then quit again as a justification for the increased age restriction." (Complaint ¶ at 21.) Another commission member, Cole Waite, "expressed that he thought he had read in an article 'from the psychology field that the brain was not mature until 25,' so he recommended 23." (Complaint at ¶ 21.) "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and

that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979).

Furthermore, Section 3.02 requires that the Mayor "shall have attained the age of 23 years *prior to the date of his or her election.*" Streetsboro City Charter Art. III, § 3.02 (emphasis added). At all relevant times in the history of Section 3.02 as adopted, from the consideration by the Charter Review Commission to the eventual certification by the Board of Elections following passage by the citizens of Streetsboro, the next scheduled mayoral election was scheduled for November 2011. (Stipulations at ¶ 10) There is no allegation, and absolutely no proof or suggestion in the record, that, at the time Section 3.02 was adopted, anyone could have known that Mayor Thomas Wagner would resign in April 2009 and an election would be necessitated in November 2009 for the balance of his unexpired term. Plaintiff was born March 9, 1988. (Stipulations at ¶ 1) In November 2011, McClafferty will be 23 years old and Section 3.02 will not be a bar to his candidacy. If Section 3.02 was born out of a personal animus towards Mr. McClafferty, it was surely a poorly executed plan, as it would have barred him from nothing related to the next regularly scheduled mayoral election.[8]

Given the deferential standard that applies to age restrictions, the Court finds that it is not likely that McClafferty will be able to proffer sufficient reason for this

---

**8.** At oral argument, when faced with these facts, counsel for Plaintiff noted that Section 4.03 of the Streetsboro City Charter requires a city Councilperson to "have attained the age of 23 years prior to the time of his or her filing a petition for nomination to office [...]." The Court cannot, and does not attempt to, explain the rationale behind having different age evaluation dates for the two of-

fices. Whatever the reasoning, it is clear that the age requirement in Section 4.03 has no effect on whether McClafferty would have been eligible for the November 2011 mayoral election. McClafferty expounded at oral argument his theory that the manner in which the ballot language presented to the voters violated his substantive due process rights as fundamentally unfair. The Court disagrees.

Court to infer antipathy. His skepticism of the charter review commission's subjective motivations and the timing of the amendment's enactment are insufficient for this Court to conclude that an animus towards his personal candidacy was the sole reason behind Section 3.02. Therefore, this Court concludes that McClafferty is not likely to prevail on his claim that Section 3.02 is unconstitutional.

### 1. *Attack Upon the Ballot Language*

■ In addition to challenging the age restriction in Section 3.02, Plaintiff also attacks the way in which Ordinance 2007–88, containing the amendment to Section 3.02, was presented to the voters in the 2007 election.[9] Specifically, Plaintiff maintains that by "flipping" the criminal conviction disclosure requirement and the age restriction, the Board prominently placed the "universally popular" criminal disclosure at the top of the measure assuring its passage.[10] (Mot. at 5.) While not explicitly raised in his Complaint,

McClafferty argued, at oral argument and based upon *Duncan v. Poythress*, 657 F.2d 691 (5th Cir.1981), that "[i]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order." *Id.* at 703.[11] At the outset of this discussion, the Court wishes to note

that it doubts whether McClafferty has standing to bring a claim asserting the rights of the voters of Streetsboro and its concern that McClafferty did not raise this argument in his Complaint. Even given these concerns, however, a brief review of *Duncan* quickly reveals that no such situation is present in this case.

In *Duncan*, a group of registered voters claimed the appointment of a successor to a resigning justice of the Georgia Supreme Court violated Georgia's special election statute, and thereby, their constitutional right to vote. *Duncan*, 657 F.2d at 692–93. While *Duncan* noted that "[o]f course, most cases of federal court intervention [in voting rights cases] have been brought under the fourteenth amendment's equal protection clause," invalidation under the substantive due process clause is appropriate if "it implicates the very integrity of the electoral process." *Id.* at 702–03. In *Duncan*, the appointment of the successor judge deprived the entire state electorate of the right to participate in an election. State officials "[...] purposely abrogated the right to vote [...]." and the court in *Duncan* held that "[i]t is fundamentally unfair and constitutionally impermissible [under the substantive prong of the due process clause] for public officials to disenfranchise voters in violation of state law [...]." *Id.* at 703–04. *See also Griffin v.*

---

9. It is unclear whether Plaintiff raises this argument as an alternative claim for relief, or whether it is merely offered to bolster his due process claim.

10. Plaintiff explains that "[b]y misstating the actual language of the ordinance on the ballot, both the City of Streetsboro and the Portage County Board of Elections were able to present the age-bar as a mere secondary issue on the ballot because both knew the criminal conviction disclosure requirement—which had universal appeal—would probably do the trick in burying the arbitrary age limitation. In any event, with voters affirming a new charter provision to require all candidates to

execute a criminal conviction disclosure form, the effect of it would force them at the same time to bar all 18–22–year-olds, including 21–year-old McClafferty, from elective office." (Mot. at 6.)

11. A claim that the election process is fundamentally unfair disenfranchises *all* voters, not just a segment of the population differentiated by age, or race, or some other characteristic. This distinction explains why McClafferty's age discrimination claim cannot properly be analyzed under substantive due process principles, but the ballot language "flipping" argument can.

*Burns,* 570 F.2d 1065 (1st Cir.1978) (where the voter has been effectively deprived of the ability to cast a legal vote implicates federal due process concerns).

In a very recent case, *League of Women Voters v. Brunner,* 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit held that the "the Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *Id.* at 478. In *League of Women Voters,* the Sixth Circuit suggested that allegations made by the League of Women Voters, "if true, may present the exceptional case." *Id.* There, the League alleged that:

> registered voters were denied the right to vote because their names were missing from the rolls. Inadequate provision of voting machines caused 10,000 Columbus voters not to vote. Poll workers improperly refused assistance to disabled voters. Provisional ballots were not distributed to appropriate voters, causing voters to be denied the right to vote. At the same time, provisional ballots were provided to other voters without proper instructions, causing 22% of provisional ballots cast to be discounted.

*Id.* These violations, which were supported with specific factual allegations, the court suggested, would result in "massive disenfranchisement and unreasonable dilution of the vote" and to that extent due process concerns would be implicated. *Id.*

McClafferty does not present a case where "those rare, but serious, violations of state election laws [ . . . ] undermine the basic fairness and integrity of the democratic system." *Duncan,* 657 F.2d at 699. Unlike the situations in *Duncan* and *League of Women Voters,* it appears that the City of Streetsboro and the Portage County Board of Elections followed proper procedures to the letter of the law. The Charter Review Commission met in 2007, as it was required to do so under the City Charter. (Stipulations at ¶¶ 11, 14–15.) The Charter Review Commission presented its proposed amendments to the Streetsboro City Council, including the amendment to Section 3.02 at issue in this case, on June 27, 2007, in advance of the July 1 statutory deadline. (Stipulations at ¶¶ 12, 16.) The City Council approved the amendments and submitted the proposed amendments in the form of a ballot to the Board of Elections on July 23, 2007, in advance of the August 1 statutory deadline. (Stipulations at ¶¶ 13, 18.) The Board of Elections reviewed the proposed ballot and forwarded it, as required by law, to the Ohio Secretary of State, who in turn reviewed and approved the ballot language. (Stipulations at ¶¶ 19–20.) The voters approved the amendments and the Board timely certified the results of the election. (Stipulations at ¶¶ 21–22.) The Court finds it exceedingly unlikely that any attack upon the election process would succeed on the merits.

■ As for Plaintiff's attack upon the ballot language, itself, the Court finds that any such challenge is likely barred by the doctrine of laches. "It is well established that in election-related matters, extreme diligence and promptness are required." *State ex rel. Comm. for the Referendum of Ordinance No. 3543–00 v. White,* 90 Ohio St.3d 212, 214, 736 N.E.2d 873 (2000). When a party fails to exercise diligence in seeking extraordinary relief in an election-related matter, laches may bar the claim. *State ex. rel. Demaline v. Cuyahoga County Bd. of Elections,* 90 Ohio St.3d 523, 526, 740 N.E.2d 242 (2000). The party challenging the election bears the burden of demonstrating that "they acted with the requisite diligence." *Id.; State ex. rel. Manos v. Delaware County. Bd. of Elections,* 83 Ohio St.3d 562, 564, 701 N.E.2d 371 (1988).

■ "Laches is the 'negligent and unintentional failure to protect one's rights.'" *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir.2002) (quoting *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). The doctrine is rooted in the notion that "those who sleep on their rights lose them." *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, 2006 WL 20523, at *14 (E.D.Mich. Jan. 4, 2006) (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir.1999)). Laches does not simply concern itself with the passage of time, but rather focuses on the question of whether a delay renders it inequitable to permit the claims to be enforced. *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir.2003). As such, a party asserting laches must show: (1) a lack of diligence by the party against whom the defense is asserted; and (2) prejudice to the party asserting it. *Ford Motor Company*, 342 F.3d at 550; *Nartron Corp.*, 305 F.3d at 408.

The content of ballot language is governed by § 3505.06(E) of the Ohio Revised Code, which provides:

> The questions and issues ballot need not contain the full text of the proposal to be voted upon. A condensed text that will properly describe the question, issue, or an amendment proposed by other than general assembly shall be issued as prepared and certified by the secretary of state for state-wide questions or issues or by the board for local questions or issues. If other than a full text is used, the full text of the proposed question, issue, or amendment together with the percentage of affirmative votes necessary for passage as required by law shall

be posted in each polling place in some spot that is easily accessible to the voters.

Ohio Rev.Code § 3505.06(E). Pursuant to Ohio Rev.Code § 3505.062(D), the Ohio Ballot Board must certify the ballot language to the Secretary of State of Ohio.

It is clear from the record that Plaintiff had four opportunities to challenge the ballot language. First, Plaintiff could have contested the proposed ballot language prior to the 2007 election by filing a petition with election officials, pursuant to Ohio Rev.Code § 3501.39. A second opportunity would have presented itself immediately after the election. Section 3515.08 provides a mechanism for contesting the results of any election, so long as the objection is raised within 15 days of the certification of the election results.[12] Ohio Rev.Code § 3515.08. Also following the election, Plaintiff could have sought a mandamus action with the Portage County Court of Common Pleas. *See, e.g., State ex rel. Carberry v. City of Ashtabula*, 93 Ohio St.3d 522, 757 N.E.2d 307 (2001); *State ex rel. Newell v. Tuscarawas County Bd. of Elections*, 93 Ohio St.3d 592, 757 N.E.2d 1135 (2001).

Though well beyond the time period for challenging ballot language by any one of the three mechanisms mentioned above, one final opportunity to be heard on the issue presented itself immediately after the September 3, 2009 protest hearing. While Plaintiff announced at the conclusion of the hearing that he intended to file a federal lawsuit immediately, he waited three weeks, days before early election had begun,[13] to file the instant action.

---

12. The petition must be signed by at least twenty-five (25) voters who voted at the last election. Ohio Rev.Code § 3515.09.

13. Under Ohio law, early voting may begin thirty-five (35) days prior to the election. Ohio Rev.Code § 3511.04. With respect to the November 3, 2009 election, the electorates of Portage County are entitled to begin early voting on September 29, 2009.

In response to Defendants' assertion of laches, Plaintiff maintains that he was not aware until recently that the ballot language was flipped. The Court is not persuaded. The language on the 2007 ballot was a summary of Ordinance 2007–88. Where the ballot language represents a summary of any proposed legislation, Ohio Rev.Code § 3505.06 requires that the full text of the ordinance "shall be posted in each polling place in some spot that is easily accessible to the voters." Ohio Rev. Code § 3505.06(E). There is nothing in the record to suggest that the required posting did not take place. Because Plaintiff did not avail himself of the right to review the entire text at the polling station, he cannot now claim that the information of the alleged "flipping" was only recently available to him.

Despite the fact that the ballot language for the 2007 election was filed with the Secretary of State *prior* to the election in 2007, Plaintiff has waited until almost two years *after* the election, and days before early voting was to take place, to question the amendment language as it appeared on the fall 2007 ballot. Such an inexcusable delay causes the Court to believe that this issue may be foreclosed by laches. *See, e.g., State ex rel. Demaline,* 90 Ohio St.3d at 527, 740 N.E.2d 242 (challenge to ballot language that was filed after statutory date for filing for printing ballots was barred by the doctrine of laches); *State ex rel. Manos,* 83 Ohio St.3d at 564, 701 N.E.2d at 373 (plaintiffs' challenge to ballot language was denied where they failed to meet burden of demonstrating diligence in raising challenge after the ballot language had been submitted to the Secretary of State).

Balanced against Plaintiff's delay is the harm that will befall Defendants and the voters if Plaintiff's belated challenge is permitted to proceed. As Defendants have outlined in the respective briefs, the election is already underway. (Stipulations at ¶ 33.) Voting machines have been programmed and "locked down," paper ballots for the absentee voters have been printed, and printed ballots for absent members of the armed forces have already been mailed. In addition, early voting began on September 29, 2009. (Stipulations at ¶ 33.) Defendants estimate, and Plaintiff does not contest, that the cost of conducting a delayed special election for the office of mayor would be between $24,000 and $25,000 and "the cost of reprinting the paper ballots and rotating the names and reconfiguring, re-testing, and re-calibrating the electronic ballots will exceed the cost of the special election." (Doc. No. 8, City Opp. Brief at 7–8.)

 Even assuming due diligence, the Court finds it unlikely that Plaintiff's attack upon the ballot language would succeed on the merits. The standard for evaluating ballot language was set forth in *Burton v. Georgia,* 953 F.2d 1266 (11th Cir.1992). There, the court held that:

> it must be demonstrated that the state's choice of ballot language so upset the evenhandedness of the referendum that it worked a "patent and fundamental unfairness" on the voters. Such an exceptional case can arise, in the context of a case such as this one, only when the ballot language is so misleading that the voters cannot recognize the subject of the amendment at issue. In such a case, voters would be deceived, in a concrete and fundamental way, about "what they are voting for or against."

> \* \* \*

> As long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires

no more than that the voter not be deceived about what the amendment is at issue.

953 F.2d at 1269 (quoting *Burger v. Judge*, 364 F.Supp. 504, 511 n. 16 (D.Mont.1973)).

Federal ballot language cases that followed have adopted the standard announced in *Burton. See, e.g., Nat'l Audubon Society v. Davis*, 144 F.Supp.2d 1160, 1171 (N.D.Cal.2000), rev'd, in part, on other grounds, 307 F.3d 835 (9th Cir.2002); *Citizens for Legislative Choice v. Miller*, 993 F.Supp. 1041, 1050 (E.D.Mich.1998). Further, Ohio courts have applied similar standards in ruling on ballot language claims. *See Jurcisin v. Cuyahoga County. Bd. of Elections*, 35 Ohio St.3d 137, 141–42, 519 N.E.2d 347 (1988) (upholding ballot language that was not "inaccurate, incorrect, or illegal [ . . . ] confusing, misleading, or argumentative."); *North Coast Peninsula II v. Ottawa County Bd. of Elections*, 1989 WL 5412, at \*2, 1989 Ohio App. LEXIS 258, at \*5 (Ohio Ct.App. Sixth Dist. Jan. 27, 1989) (language of zoning amendment was not "misleading, inaccurate, or contain[ed] material omissions that would confuse the average person.")

While Plaintiff complains that the provisions of Section 3.02 were "flipped" on the ballot, he does not claim that the ballot language inaccurately represented the proposed amendment, or that the language submitted suffered from material omissions. Indeed, the Court finds that the ballot language was clear, precise, and easily understandable. It was not so extensive that the voters would be unable to discern its meaning. Instead, the voters had before them an accurate and complete summary of the amendment. Consequently, it is unlikely that Plaintiff could establish that the voters were deceived as to the nature of the proposed amendment such that the election process was rendered fundamentally unfair. Therefore, his attack

upon the ballot language would not likely lend support to his due process claim.

Plaintiff's failure to establish any likelihood of success on the merits is fatal to his request for a preliminary injunction. "While, as a general matter, none of the[ ] four [preliminary injunction] factors [is] given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Mich. State AFL–CIO*, 103 F.3d at 1249. Accordingly, the Court finds that Plaintiff has failed to meet his burden of proving entitlement to preliminary injunctive relief. The motion is denied.

### III. Conclusion

Finding that Plaintiff has failed to establish any likelihood of success on the merits, his motion for preliminary injunction is **DENIED.**

**IT IS SO ORDERED.**